UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| SOUTH TEXAS NEON SIGN CO., INC. | § | |
| d/b/a SOUTH TEXAS NEON SIGN | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 5:08-CV-00116 |
| | § | |
| IXTAPA, INC. d/b/a SOUTH TEXAS | § | |
| NEON SIGNS | § | |
| Defendant. | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Ixtapa, Inc. d/b/a/ South Texas Neon Signs ("Defendant" or "South Texas Valley") files this motion for summary judgment against Plaintiff, South Texas Neon Sign Co., Inc. d/b/a/ South Texas Neon Sign ("Plaintiff" or "South Texas Laredo") for the claims asserted in Plaintiff's Complaint (Dkt. 1).

Plaintiff's claims all hinge on Defendant's continuous use of the names South Texas and South Texas Neon for a neon sign business in some form since 1994. The gravamen of Plaintiff's complaint is that Defendant's use of the names South Texas and South Texas Neon for a neon sign business unfairly competes with and infringes Plaintiff's use of the same names for a neon sign business (Counts 1 and 2) and causes injury to the Plaintiff's reputation (Count 3).

Plaintiff cannot prevail because South Texas and South Texas Neon are unprotectable descriptive names that did not have secondary meaning in 1994 when South Texas Valley entered the neon sign market in the Rio Grande Valley. Plaintiff is also barred by the doctrine of laches and the doctrine of acquiescence.

Plaintiff cannot provide any admissible evidence that the marks South Texas and South Texas Neon for a neon sign business acquired secondary meaning anywhere (let alone in the Rio Grande Valley) in 1994, when Defendant began extensively using the marks. Additionally, Plaintiff sent two cease and desist letters to Defendant in 2001. Thereafter, Plaintiff completely

1

dropped the ball and did nothing further regarding its complaints thus establishing a textbook case of laches and acquiescence. Finally, Plaintiff took no action at all during the statute of limitations period of two to four years which ran in 1996 or 1998 or 2003 or 2005, depending on how you calculate it. Laches is presumed once the statute of limitations has run.

## BACKGROUND FACTS

Plaintiff is a Texas Corporation that operates a neon sign business in Webb County, Laredo under the name South Texas Neon. Plaintiff has incomplete websites at www.southtexasneon.com and www.southtexasneonsigns.com which were created and published long after this dispute arose.[1] South Texas Laredo claims to have operated a neon sign business from a sole Laredo, Texas facility since 1963. Plaintiff has never advertised in the Valley Yellow Pages or other directories or news papers or television or radio or any other advertisement under the name South Texas Neon in the Valley.[2] Plaintiff has never had a location in the Valley. There are no business records of any activities of Plaintiff in the Valley prior to 1994 when Defendant South Texas Valley began business its neon sign business in the Rio Grande Valley.[3]

Defendant, South Texas Valley, is also a Texas corporation and is located in Pharr, Texas. South Texas Valley's trade territory is the Rio Grande Valley (the Valley) comprising the four county area of Hidalgo, Starr, Willacy, and Cameron counties.[4] Defendant manufactures neon signs under the name South Texas Neon.[5] Raul Gonzales began operating in commerce in the Valley as sole proprietor South Texas Signs since at least as early as 1994.[6] Raul Gonzales

---

[1] Juan Molina Dep. 100:17-102:1, Apr. 20, 2009; Declaration of Charles W. Hanor at ¶ 4 and Exhibits 68 and 69 from Juan Molina's deposition.
[2] Juan Molina Dep. 91:21-92:2.
[3] Maria Gonzales Molina Dep. 65:24-69:18, Apr. 28, 2009; Juan Molina Dep. 64:10-66:24.
[4] Declaration of Charles W. Hanor, June 16, 2009 at ¶ 6 and Exhibit 1: Map: Counties, Cities and Towns in the Rio Grande Valley of Texas, The University of Texas – Pan American Data and Information Systems Center, 2002 (based upon data from the U.S. Census Bureau, 2000). *See also* www.valleychamber.com/map.shtml.
[5] Declaration of Mr. Raul Gonzales III at ¶ 46 and Exhibit 2: Defendant's web site demonstrates Defendant's use of its marks.
[6] *Id.* at ¶ 42 and Exhibit 3: Telephone directory advertisements from 1994 to present.

incorporated Defendant with the State of Texas in 1999 as Ixtapa, Inc. and carried on his prior neon sign business as South Texas Neon Signs or South Texas Neon.[7] Defendant registered the assumed name South Texas Signs with the Secretary of State of Texas, Certificate No. 0002897-3845, on December 8, 1999 and said certificate is in full force and effect.[8] Defendant registered the assumed name South Texas Neon Signs with the Secretary of State of Texas, Certificate No. 0002897-3848, on December 8, 1999 and said certificate is in full force and effect.[9]

The distance between Plaintiff's sole manufacturing facility (Laredo) and Defendant's sole manufacturing facility (Pharr) is about 122 miles in a straight line, and a greater distance by navigable roadways.[10] This distance is significant and a costly expense when you are driving a large work truck carrying a sign and with a crane and tools for installation or repair.

Neither party has any trademark registration so actual notice is required to prevent another's acquisition of common law trademark rights in another geographical area. Obtaining a corporate name, domain name and assumed name does not establish trademark rights or give constructive notice under Texas law or the Federal Lanham Act which require actual use.

On July 13, 2001, Plaintiff's attorney sent a cease and desist letter to Defendant demanding that Defendant stop using the name South Texas Neon Sign "in any advertisements, letterhead, or any items which have this name."[11] Plaintiff's attorney sent a subsequent letter, dated August 15, 2001 to Defendant's attorney.[12] Because Defendant believed it had the right to continue using South Texas as its name, and told Plaintiff so, Defendant had every reason to

---

[7] *Id.* at ¶ 32 and Exhibit 4.
[8] *Id.* at ¶ 33 and Exhibit 5.
[9] *Id.* at ¶ 34 and Exhibit 6.
[10] Hanor Declaration at ¶ 7 and Exhibit 7, map printed from Google Maps.
[11] Gonzales Declaration at ¶ 48 and Exhibit 8, cease and desist letter, dated July 13, 2001, from Plaintiff's attorney, J. Dickerson, to Defendant.
[12] *Id.* at ¶ 49 and Exhibit 9, cease and desist letter, dated August 15, 2001, from Plaintiff's attorney, J. Dickerson, to Defendant's attorney Mr. J. Roel Garcia.

believe that Plaintiff had abandoned its claim was never going to pursue the matter.[13] Plaintiff knew that Defendant was operating openly and notoriously from 1994 to 2008 and watched Defendant grow into a substantial business. After lulling Defendant into believing everything was OK, Plaintiff blindsided Defendant in 2008 by filing this suit without warning.

Plaintiff has destroyed its business records prior to 2003 including five years of business records after it sent the cease and desist letter in 2001.[14] Accordingly, it has not produced any business records of activities, revenues or advertising expenditures in any geographical area prior to or at the time of Defendant's adoption of the South Texas name in 1994.

## STANDARDS FOR SUMMARY JUDGMENT

The purpose of a motion for summary judgment is to determine whether there exist genuine issues of material fact to be tried.[15] Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[16] A factual issue is material if its resolution could affect the outcome of the action and disputes about such factual issues are genuine if the evidence would allow a reasonable jury to find for the non-moving party.[17]

## ARGUMENT

### I. SOUTH TEXAS IS NOT A PROTECTABLE MARK

#### a. Classification of a Trademark

"The threshold issue of any action for trademark infringement is whether the word or phrase is initially registrable or protectable."[18] The first step in such an analysis is classifying the

---

[13] *Id.* at ¶ 52.
[14] Maria Gonzales Molina Dep. 65:24-69:18; Juan Molina Dep. 64:10-66:24.
[15] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[16] FED. R. CIV. P. 56(c).
[17] *GeoSouthern Energy Corp. v. Chesapeake Operating, Inc.*, 274 F.3d 1017, 1020 (5th Cir. 2001).
[18] *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983).

4

mark as either (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary.[19] A mark is generic where it "is the name of a particular genus or class of which an individual article or services is but a member."[20] Generic marks are never protectable.[21] Descriptive marks identify "a characteristic or quality of an article or service" and are only protectable if they acquire secondary meaning.[22] Suggestive terms require the "effort of the imagination by the consumer in order to be understood as descriptive."[23] Finally, arbitrary or fanciful names "bear[] no relationship to the product or service."[24]

"Whenever a word or phrase conveys an immediate idea of the qualities, characteristics, effect, purpose, or ingredients of a product or service, it is classified as descriptive and cannot be claimed as an exclusive trademark."[25] The distinction between generic marks and descriptive marks is often a fine line.[26] However, where a mark is generic, it is not protectable "no matter how much money and effort the user . . . has poured into promoting the sale of its merchandise and what success it has achieved in securing pubic identification."[27]

b.  *Determining a Trademark's Classification*

### i. South Texas Neon is Generic

"Neon" is a generic name for the parties' businesses. Both parties are in the neon sign business in their trade territories in South Texas. Because a generic mark is never protectable,

---

[19] *Id.*
[20] *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir. 1979).
[21] *Zatarains*, 698 F.2d at 790.
[22] *Vision Center*, 596 F.2d at 115.
[23] *Id.*
[24] *Id.*
[25] *Zatarains*, 698 F.2d at 792.
[26] *Id.* at 790.
[27] *Abercrombie & Fitch, Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (Friendly, C.J.).

Plaintiff's claims must fail. Giving Plaintiff a monopoly on the names South Texas or South Texas Neon would prevent competitors from describing their goods and services accurately. [28]

### ii.   Even if the Mark is Not Generic, it is Descriptive

In determining whether a trademark is descriptive, courts consider four tests: (1) dictionary test, (2) imagination test, (3) competitor test, and (4) marketing test.[29] As explained below, the application of these tests to the instant case demonstrates that if South Texas Neon Sign is not generic, it is undoubtedly descriptive.

### 1.   The Dictionary Test

Using the dictionary test, a court looks to a dictionary definition of the word to establish the public understanding of the significance and meaning of the word.[30] Here, it is clear that South Texas Neon is at least descriptive, if not generic. As a noun, dictionary.com defines "neon" as "a sign or advertising sign formed from neon lamps."[31] As an adjective, dictionary.com defines "neon" as "made of or formed by a neon lamp or lamps: *a neon sign.*"[32]

South Texas is also descriptive of the area in which Plaintiff's limited Laredo trade territory is confined. As explained by the Court in its ruling on Defendant's Preliminary Injunction motion, "[t]he Handbook of Texas defines South Texas as the area that occupies the southern tip of Texas that 'may be separated from the rest of the state roughly by a line drawn from Del Rio eastward to Austin and from Austin southeastward to Corpus Christi.'"[33] Accordingly, under the dictionary test, the plain meaning of "South Texas Neon" is a neon sign

---

[28] *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975) (Friendly, C.J.) (finding "consumer electronics" to be a generic term not entitled to any protection regardless of secondary meaning).

[29] *Zatarains*, 698 F.2d at 792-93.

[30] *Id.* at 792.

[31] Dictionary.com definition of "neon," www.dictionary.reference.com/browse/neon; last viewed June 16, 2009.

[32] *Id.* (emphasis in original).

[33] Order. Dkt, 44, n.8 (Feb. 27, 2009)(quoting "South Texas Plains," HANDBOOK OF TEXAS, http://www.tshaonline.org/handbook/online/articles/SS/ryslr.html (last visited February 27, 2009).

company in South Texas. This is plainly descriptive of both party's goods and services and cannot be protected absent a strong showing of secondary meaning.[34]

### 2.   The Imagination Test

After applying the dictionary test, courts use the "imagination test to "measure the relationship between the actual words of the mark and the product to which they are applied."[35] Using this test, courts look at whether the word requires any imagination to determine the nature of the goods or services offered.[36] As explained above, South Texas Neon quite literally means what it says. No leap of imagination is required to realize customers calling "South Texas Neon" are looking for neon signs.

### 3.   The Competitor Test and the Marketing Test

The third and fourth tests used to determine the classification of the mark is whether competitors need the mark to describe their own products[37] and "the extent to which a term actually has been used by others marketing a similar service or product."[38] Competitors need the mark to describe their products.[39] There is no way to describe the building and servicing of neon signs in South Texas without using the words "South Texas Neon." There are many neon sign companies in South Texas; it would be unfair to let Plaintiff monopolize this descriptive name.

### c.   *Plaintiff Cannot Demonstrate Secondary Meaning in 1994*

Considering the above factors and the mark itself, it is apparent that South Texas Neon and South Texas Neon Signs are descriptive. Thus, it is necessary for Plaintiff to demonstrate secondary meaning before any protection of the mark will be afforded. "In order to establish secondary meaning for a term, a plaintiff must show that the primary significance of the term in

---

[34] *See Aloe Crème Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir. 1970).
[35] *Id.*
[36] *Id.*
[37] *Id.* at 793.
[38] *Id.*
[39] Declaration of Mike Egan, June 16, 2009.

the mind of the consuming public is not the product but the producer."[40] "The holder of a descriptive mark has priority over another's use of a similar mark **only in the area in which secondary meaning has been established.**"[41] Moreover, secondary meaning must be shown at the time the allegedly infringing use began, not at the time of suit.[42] The means that Plaintiff must show **secondary meaning in the Valley in 1994**. Plaintiff cannot win by showing secondary meaning **in Laredo** in 1994.

### i.  The Standard for Demonstrating Secondary Meaning is Exacting

"Plaintiff must demonstrate a high degree of proof to establish secondary meaning."[43] The necessary proof is especially high where, as in the instant case, "the mark applied to an article designates a principal ingredient desired by the public"—namely neon signs in South Texas.[44] Since secondary meaning looks to the consumers' mental association between the mark and the source of the product, "the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry."[45] Accordingly, "survey evidence is the most direct and persuasive evidence of secondary meaning."[46] Absent survey evidence, the following factors can be considered: "length and manner of the use of a mark, the nature and extent of advertising and promotion of the mark, the sales volume of the product, and instances

---

[40] *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir. 1984).
[41] *Test Masters Edu. Serv., Inc. v. Singh*, No. 01-20659, 2002 U.S. App. LEXIS 28195 at *7-8 (5th Cir. July 24, 2002) (citing 2 MCCARTHY § 16:34) (emphasis added); 2 MCCARTHY § 16:34 contains a very helpful overview of the law of secondary meaning. *See Bank of Texas*, 741 F.2d at 789 (rejecting relief where a company could only show secondary meaning in part of a city because secondary meaning must be shown in the entire area where protection is sought).
[42] *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269 n.8 (5th Cir. 1999); J. McCarthy, McCarthy on Trademarks and Unfair Competition, § 15:4.
[43] *Id.* at 269.
[44] *Milsan, Inc.*, 423 F.2d at 850.
[45] *Sunbeam Prods., Inc. v. West Bend Co.*, 123 F.3d 246, 253 (5th Cir. 1997).
[46] *Id.* at 253-54.

of actual confusion."[47] However, "***none of these factors alone will prove secondary meaning***" and the important inquiry is the *effect* of promotional efforts, not their extent.[48]

### ii. *Bank of Texas* and *Test Masters* Demonstrate the Extreme Proof Required by the Fifth Circuit to Show Secondary Meaning

In *Bank of Texas*, the Fifth Circuit affirmed a judgment as a matter of law overturning a jury verdict on the issue of secondary meaning for a descriptive mark.[49] The verdict was reversed despite a survey showing 56.7% name recognition, nine years of exclusive use of the "Bank of Texas" name, evidence of advertising expenditures and word of mouth advertising, evidence of instances of actual confusion, and evidence of growth of assets and deposits.[50] The Fifth Circuit held that this was not enough evidence for a reasonable person to find secondary meaning.[51]

Likewise, the Fifth Circuit decision in *Test Masters*, is illustrative of the onerous burden of proof Plaintiff carries.[52] In *Test Masters*, the Fifth Circuit overturned a jury verdict finding secondary meaning for insufficient evidence.[53] The insufficient evidence consisted of "four advertisements," five testimonials, testimony that competitors "referred to [the mark] 'hundreds of times' in their ads," and "forty or so email messages from individuals" which may have constituted instances of confusion.[54] Many other cases have had similar results.[55]

Regardless of the seemingly impressive amount of evidence presented in both *Bank of Texas* and *Test Masters*, the Fifth Circuit held it was not enough.[56] Likewise, Plaintiff cannot

---

[47] *Id.* at 254.
[48] *Id.* (emphasis added).
[49] *Bank of Texas*, 741 F.2d at 786.
[50] *Id.* at 788-89.
[51] *See id.* at 787-88 n.5.
[52] *Testmasters Educ. Serv., Inc. v. Singh*, No. 01-20659, 2002 U.S. App. LEXIS 28195 (July 24, 2002).
[53] *Id.* at *16-17
[54] *Id.* at *10-16.
[55] *Sugar Busters LLC*, 177 F.3d at 270; *Sunbeam Prods., Inc.*, 123 F.3d at 254; *Boston Beer Co. LP v. Slesar, Bros. Brewing Co, Inc.*, 9 F.3d 175, 181-83 (1st Cir. 1993); *Papercutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 565 (2d. Cir. 1990); *Zatarains, Inc.*, 698 F.2d at 797; *The Vision Center*, 596 F.2d at 119; *USA Fotball, Inc. v. Timothy B. Robinson, USA Football, Inc.*, Civ. No. H-03-4858, 2004 U.S. Dist. LEXIS 28087 (S.D. Tex. Sep. 20, 2004).
[56] *Bank of Texas*, 741 F.2d at 786; *Test Masters*, 2002 U.S. App. at *16-17.

create a fact issue because even if all evidence is taken in its favor, Plaintiff cannot show enough evidence to demonstrate secondary meaning in the names South Texas and South Texas Neon.

Plaintiff willingly destroyed the only direct evidence which might have helped demonstrate its market penetration in 1994—its business records.[57] Without its business records, Plaintiff cannot demonstrate any sales revenues, advertising, market penetration, or even length and manner of use.[58] Where a party has the burden of proof on an issue which relies on evidence of sales and market penetration, that parties destruction of its documents "makes a decision in its favor less likely."[59]

The only evidence of alleged "instances of confusion"[60] occurred well after Defendant began using its mark in 1994. These alleged "instances of confusion" could just as easily constitute evidence that Defendant's mark has acquired secondary meaning in the Rio Grande Valley or that Plaintiff was infringing by moving into South Texas Valley's trade territory of the Rio Grande Valley. Nevertheless, this factor alone is insufficient to demonstrate secondary meaning regardless of the volume of alleged instances of confusion.[61]

### iii.   Plaintiff Cannot Show Secondary Meaning in the Valley in 1994

Plaintiff must show secondary meaning in every geographical area in which they are seeking protection. In *Bank of Texas* the plaintiff could only show secondary meaning in one part of Dallas County and not the entire Dallas County where it claimed trademark rights.[62] The Court held that this was not enough to garner protection in the entire county.[63] Likewise, Plaintiff

---

[57] Maria Molina Gonzales Dep. 65:24-69:18; Juan Molina Dep. 64:10-66:24.
[58] Plaintiff claims to have installed a few signs in the Valley prior to 1994. Installing a sign in the Valley that was ordered in Laredo does show reputation in the Valley.
[59] *Natural Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1400 n.40 (3d Cir. 1985).
[60] Mis-deliveries by vendors and suppliers long after the parties began using their marks is not evidence of confusion between **customers** which is all that counts. *See Bank of Texas*, 741 F.2d at 788-89 (noting that there was "little evidence of actual *consumer* confusion").
[61] *Sunbeam Prods., Inc.*, 123 F.3d at 253.
[62] *Bank of Texas*, 741 F.2d at 789.
[63] *Id*.

must do more than show secondary meaning in Laredo in 1994—it must show secondary meaning in every place where it seeks damages and protection.[64]

While the Plaintiff may try to prove that the Valley and Laredo constitute one big trade territory, the evidence belies their conclusion. Indeed, Plaintiff claims that it would be a hardship to litigate in the Valley.[65] And, of all the people who could allegedly "vouch for Plaintiff's longevity," all of the contacts arose in Laredo.[66] Even today, Plaintiff's sales in the Valley are miniscule at best with no evidence what-so-ever relating to any sales or advertising prior to 2003.[67] Thus, even if Plaintiff could prove secondary meaning in Laredo in 1994, it could not prove secondary meaning in the Valley in 1994.

There are no financial records of any sales or advertising made my Plaintiff in the Valley prior to 2003. Plaintiff claims that it only keeps records 5 years.[68] There are no business records regarding any jobs that Plaintiff claims to have done in the Valley from 1963-2003.[69] Assuming these jobs compared to the number of jobs Plaintiff does in a typical years like 2003-2008 where Plaintiff has business records, they would be a minute percentage of Plaintiff's business.[70] And, even this is likely an overstatement as Plaintiff's limited business in the Valley seems to have increased in the last year.

Plaintiff admits it has never done any promotion or advertising of any kind in the Rio Grande Valley, before or after 1994.[71] Indeed, Plaintiff has never had so much as a Yellow Page

---

[64] *Id.* ("Since appellant sought to enjoin the use of the name BancTEXAS in all of Dallas County . . . it had the corresponding burden of proving that it a protectable interest in that name in the entire area.")

[65] Declaration of Juan Molina, Nov. 24, 2008, Dkt 12-2.

[66] Maria Molina Gonzales Dep. 55:17-59:24.

[67] Hanor Declaration at ¶ 8 and Exhibit 11: Defendant's counsel compiled a summary of Plaintiff's business records which showed only miniscule sales in the Valley between 2003 and 2008.

[68] Plaintiff claims that destroying records after five years is "logical" and "common" and "obvious" to do so. Maria Molina Gonzales Dep. 67:22-68:7. However, Plaintiff's proffered "expert" does not agree with Plaintiff's assessment on document retention. His website states that annual financial reports and trademark records should never be destroyed. See http://www.vfcpa.net/retention.htm.

[69] Maria Molina Gonzales Dep. 65:24-69:18; Juan Molina Dep. 64:10-66:24.

[70] Hanor Declaration at ¶ 8 and Exhibit 11.

[71] Answer, Dkt. 7, ¶ 123.

listing in the Valley.[72] Plaintiff has no traveling salespersons; Maria "Toni" Gonzales does all sales for the company from its Laredo office.[73] In recent years, Plaintiff has set up incomplete web sites.[74] Plaintiff cannot seriously rely upon these embarrassing web sites which did not exist until 2007, to show consumer recognition when they are incomplete and "under construction." There is no evidence of the number of hits or accesses to the Plaintiff's web sites or the internet protocol (IP) addresses of the people viewing Plaintiff's websites.

In sum, there is no evidence of any advertising by Plaintiff in the Valley and thus no chance that customers in the Valley have developed an association between Plaintiff and the name South Texas Neon. Plaintiff cannot offer any of the types of evidence listed in *Bank of Texas*—Plaintiff does not have survey evidence or any business records at all prior to 2003.[75] A few cheerleader witnesses are not enough evidence to prove secondary meaning.[76]

### iv.  Plaintiff Cannot Show Secondary Meaning Anywhere in 1994

Indeed, Plaintiff cannot show secondary meaning anywhere at the time South Texas Valley first began use of its marks in 1994—even in Laredo. Survey evidence is the most persuasive way to demonstrate secondary meaning and Plaintiff has neither named a survey expert nor has it produced any survey evidence attempting to demonstrate secondary meaning.[77] Thus, the only way Plaintiff could show secondary meaning would be to show business records prior to 1994 regarding the above factors. However, Plaintiff has no records from 1994.[78] Thus, Plaintiff asks this court to find that its mark had secondary meaning in 1994 without providing

---

[72] Juan Molina  Dep. 91:21-92:6.
[73] Maria Molina Gonzales Dep. 105:23-24.
[74] Juan Molina Dep. at 100:17-102:1; Hanor Declaration at ¶ 4 and Exhibits 68 and 69.
[75] Maria Molina Gonzales Dep. 65:24-69:18; Juan Molina Dep. 64:10-66:24.
[76] *See Vital Pharms., Inc. v. Am. Body Bldg. Prods., LLC*, 511 F. Supp. 2d 1303, 1312 (S.D. Fla. 2007) (stating that the judge "cannot accept the testimony of only two individuals as sufficient evidence of secondary meaning."); *Test Masters*, 428 F.3d at 568 (5th Cir. Tex. 2005) (stating "the testimonial evidence was insufficient because there were few in number").
[77] *See Sunbeam Prods., Inc.*, 123 F.3d at 253-54.
[78] Maria Molina Gonzales Dep. 65:24-69:18; Juan Molina Dep. 64:10-66:24.

any business records or documentation what-so-ever which would tend to show that consumers had formed a mental association between the name South Texas Neon and Plaintiff.

## II.   PLAINTIFF'S MARKET AREA DOES NOT INCLUDE THE VALLEY

### a.   Determining Market Area of a Mark

If secondary meaning of a common law descriptive mark is established, a court must then determine the geographical market area. Trademark rights are based on adoption and use.[79] It is common for multiple companies to use the same trademark or trade name for similar goods and services in geographically separate trade territories and be able to enjoin each other from expanding into each other's established trade territory.[80] This is known as concurrent use trademark rights. Even a first user of a common law mark cannot move into the geographical trade territory of a second common law user and infringe on the trademark rights of the second user.[81] Use of a trademark in one county or part of a state does not give one the exclusive right in the entire state or county.[82]

A party's trade territory is determined based upon its "zone of reputation -- that is, the reputation, advertising, and sales proven in a given service area."[83] When Defendant adopted South Texas in 1994, Plaintiff's trade territory of Laredo, Texas did not include Defendant's trade territory of the Valley.[84] Plaintiff had never advertised or operated a facility in Defendant's trade territory. Had Plaintiff truly operated in the Valley, it would have known about Defendant's open and notorious existence and operations beginning in 1994. It is inconceivable that Defendant could have directly competed with Plaintiff in Plaintiff's trade territory for years,

---

[79] Incorporation under a name and filing an assumed name certificate does not give one a right to publicly use the name and trademark rights control.
[80] *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403 (1916) (the "Tea Rose" case); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90 (1918).
[81] See *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 101-102 (U.S. 1918)
[82] See *C P Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690 (5th Cir. Tex. 2001); *Bank of Texas*, 741 F.2d at 785; *Acme Refrigeration Supplies v. Acme Refrigeration*, 961 F. Supp. 936 (E.D. La. 1996).
[83] *Peaches Entertainment Corp. v. Entertainment Repertoire Assocs.*, 62 F.3d 690, 694 (5th Cir. La. 1995).
[84] More than 3,000 users incorporate South Texas in their trade name. See Hanor Declaration at ¶ 9 and Exhibit 10.

13

including Yellow Page and other advertisements, and never cross paths or draw Plaintiff's attention until at least 2001 when the cease and desist letters were sent.

Were these territories, Laredo and the Valley, not distinct and separate, the parties could not have co-existed for fourteen (14) years while doing millions of dollars of business and hundreds of thousands of dollars of advertising using the same South Texas name for directly competing sign businesses.[85] It was not until 2008, when Plaintiff began aggressively moving into Defendant's trade territory and misappropriating Defendant's goodwill and reputation in the Valley that a controversy was manufactured in 2008.

In support of its business identity, Defendant has extensively advertised its services in directories such as the Rio Grande Valley Yellow Pages and in other standard advertisements, such as business cards, invoices and outdoor signs within Defendant's trade territory of the Valley since at least 1994.[86] Defendant has acquired many hundreds of customers in the Valley.[87] Defendant has built up substantial goodwill and reputation as a result of its continuous operations and advertisement within the Rio Grande Valley.[88]

b. *The "Zone of Expansion" Doctrine Was Superseded by the Lanham Act*

Plaintiff may contend that the Valley is its area of natural expansion. However, the "zone of expansion" theory has come under fire since the Lanham Act was passed and courts have held that the U.S. and Texas Trademark Acts preempt any "natural expansion doctrine."[89] The *Raxton* Court held that a "natural expansion doctrine that penalized innocent users of a trademark simply because they occupied what for them would be a largely undiscoverable path of some remote prior user's expansion" is "unworkable, unfair, and, in the light of statutory protection available

---

[85] Gonzales Declaration, ¶ 41.
[86] Gonzales Declaration, ¶ 39-40.
[87] Gonzales Declaration, ¶ 32.
[88] Gonzales Declaration, ¶ 33.
[89] *Raxton, Corp. v. Anania Assocs., Inc.,* 635 F.2d 924, 930 (1st Cir. 1980).

14

today, unnecessary."[90] As such, the court held that because the Lanham Act "provides a comprehensive registration procedure establishing preemptive rights to the extent that Congress thought desirable," there is no place in the law for the zone of natural expansion theory.[91] Many treatises have recognized this.[92] Thus, Plaintiff's argument that the Valley was in its "zone of expansion" should not be considered.

      *c.   In the Alternative, the Valley was not in Plaintiff's Zone of Expansion*

Alternately, even if the Court determines that the zone of expansion theory is not preempted, Plaintiff forfeited any rights to expand into the Valley when it remained static for over forty years without any expansion at all. In determining whether an area is within the "zone of expansion," courts should consider "1) the first user's previous expansion in the area, 2) first user's previous business activity in the area, and 3) first user's dominance of contiguous area" as of the date of the junior users first use.[93] However, where "the senior user is static, and has restricted use to only one small area, such as one city, a good-faith junior user may expand into a nationwide use of the mark, subject only to an exception in the small area occupied by the senior user."[94] Applying these principals, many courts have found proper concurrent use with business as little as five miles away from each other.[95]

---

[90] *Id.*

[91] *Id.*

[92] J. McCarthy, *Trademarks and Unfair Competition* § 26:23; Restatement (Third) of Unfair Competition § 19.

[93] *Acme Refrigeration Supplies Inc. v. Acme Refrigeration of Baton Rouge Inc.*, 961 F. Supp. 936, 938 (E.D. La. 1996).

[94] *Tally-Ho, Inc. v. Coast Comm. College, Dist.*, 889 F.2d 1018, 1028 (11th Cir. 1989)(quoting J. McCarthy, *Trademarks and Unfair Competition* § 26:8, at 302).

[95] *Louisiana State Optical of Jerfferson Parish, Inc. v. Louisiana STate Optical of Kenner, Inc.*, 469 So. 2d 994 (La. App. 1985) (5 miles); *CP Interests, Inc. v. Cal. Pools, Inc.*, 238 F.2d 690 (5th Cir. 2001) (100 mile radius of Houston); *Peaches Entertainment Corp. v. Entertainment Repertoire Assocs.*, 62 F.2d 690, 692 (5th Cir. 1995)(limiting territory to a seven county area); *Tally-Ho*, 889 F.2d at 1018 (160 miles); *Spartan Food Sys., Inc. v. HFS Corp.*, 813 F.2d 1279 (4th Cir. 1987) (175 miles); *Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383 (3d Cir. 1985)(state of New Jersey only); *Weiner King, Inc. v. Wiener King Corp.*, 615 F.2d 512, 515 (C.C.P.A. 1980) (15 miles); *Katz Drug Co. v. Katz*, 188 F.2d 696 (8th Cir. 1951) (St. Louis only); *Acme Refrigeration Supplies v. Acme Refrigeration*, 961 F. Supp. 936 (E.D. La. 1996)(divided up Louisiana by Parish).

Plaintiff's business in Laredo has always been small and family run. It is a static business incapable of systematic growth and should not be allowed to hold on to the theory of expansion for forty years without ever acting on it. Hence, even if the zone of expansion theory exists, the Valley was not in Plaintiff's zone of expansion when Defendant began using in 1994.

### III.     LACHES BARS PLAINTIFF'S CLAIMS

Plaintiff's delay of fourteen years after alleged infringement began and seven years after sending a cease and desist letter is unreasonable and raises the bar of laches to its claims and damages. When the delay period exceeds the statute of limitations, laches is presumed.[96] This is true even with a continuing tort such as trademark infringement.[97] Because of the presumption, Plaintiff has the burden of showing the following elements were not met: "'(1) delay in asserting a right or claim; (2) that the delay was inexcusable; [and] (3) that undue prejudice resulted from the delay.'"[98]

#### a.  *Plaintiff Delayed in Asserting its Right or Claim*

Defendant began openly and notoriously using a mark in 1994 which Plaintiff contends is confusingly similar. Plaintiff contends that any name used by Defendant which contains "South Texas" is objectionable.[99] Hence, this dispute arose in 1994 when Defendant first began using South Texas. Accordingly, the statute of limitations began running in 1994 and ran out by 1996 or 1998 at the latest.[100]

---

[96] *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 364 (6th Cir. 1985); *Rocky Brands, Inc. v. Red Wing Shoe Co.*, 2008 U.S. Dist. LEXIS 87031 (SD Ohio 2008); Bd. of Regents v. KST Elec., Ltd., 550 F. Supp. 2d 657, 2008 U.S. Dist. LEXIS 8883 (W.D. Tex. 2008). The Fifth Circuit has yet to address the issue of whether exceeding the statute of limitations creates a rebuttable presumption of laches in a trademark case. See *Just Add Water, Inc. v. Everything But Water*, Inc., 2005 U.S. Dist. LEXIS 9444 (N.D. Tex. May 18, 2005). However, it has held that such a presumption exists in patent infringement cases. See *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 616 F.2d 1315, 1326 (5th Cir. Tex. 1980).

[97] *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.2d 829, 837-38 (9th Cir. 2002).

[98] *Elvis Presley v. Capece*, 141 F.3d 188, 205 (5th Cir 1998)(quoting *Armco*, 693 F.2d at 1161).

[99] Maria Molina Gonzales Dep. 108:4-109:10.

[100] Because the Lanham Act provides no express statute of limitations for trademark infringement claims, the analogous state statute of limitations period for trademark infringement is followed. *See Reed v. United Transp. Union*, 488 U.S. 319, 323-24 (1989); Daboub v. Gibbons, 42 F.3d 285 (5th Cir 1995); Edmark v. South Asia, 89 F.

Plaintiff sent two cease and desist letters in 2001. The first letter demanded that Plaintiff "stop using the name South Texas Neon Sign in any of [its] advertisements, letterhead, or any items which have this name" and "abandon the assumed name certificate . . . on file."[101] The letter threatened that Plaintiff would "seek further remedies to protect its rights" if Defendant did not act within fifteen (15) days. Defendant did not act and over the next sever years came to believe that Plaintiff would never pursue its "claims" because Plaintiff did not have any legitimate claims.[102] Defendant's business grew and flourished between 2001 and 2008 and Defendant increased his goodwill substantially.[103] Even if Plaintiff did somehow "restart" the statute of limitations with its cease and desist letter in 2001, it ran again in 2003 or 2005. There is no doubt that Plaintiff delayed in pursuing its claims.

### b.  Plaintiff's Delay was Inexcusable

Plaintiff's delay in filing suit was not reasonable or excusable. Despite illness in the families of Plaintiff's principals, Plaintiff continued to run day to day operations and allegedly grow each year.[104] Additionally, Plaintiff is a corporation, not a person, and the personal difficulties of its principals should have no effect on the pursuit of Plaintiff's best interests. Regardless, illness is not an excuse to delay for fourteen years after Defendant began using and seven years after sending the cease and desist letters.[105] Nothing prevented Plaintiff from bringing suit and "[i]f due consideration for [] health required a continuation of the case, the

---

Supp 2d 840 (ED TX 2000). Under Texas law, the statute of limitations for torts such as trademark infringement and false advertising is two years. Texas Trademark Act § 16.26. Regardless, some aberrant cases hold that the statute of limitations for Texas trademark infringement is four years based on a Texas common law fraud statute of limitations. *See Edmark Indus. V. South Asia Int'l*, 89 F. Supp. 2d 840, 847 (*citing* TEX. CIV. PRAC. & REM. CODE § 16.003 (Vernon 1986)).

[101] Gonzales Declaration at ¶ 50 and Exhibit 8.
[102] *Id*.
[103] *Id*. at ¶¶ 52-55.
[104] Maria Molina Gonzales Dep. 30:8-40:2, 50:1-5.
[105] *Whitehall Corp. v. Western Geophysical CO. of America*, 664 F. Supp. 1056, 1073 (S.D. Tex. 1986); *FMC Corp. v. Guthery*, Civ. No. 07-5409(JAP), 2009 U.S. Dist. LEXIS 32950 at *15 ("'[I]llness' is not typically recognized as a reasonable excuse in the laches context for patent suits." This same principal can be easily applied to the instant trademark suit.).

court could have postponed the trial and the rights of the parties would have remained as they were at the time of filing of the complaint."[106] This is especially true where Plaintiff took no steps to inform Defendant that it intended to ultimately file suit.[107]

### c.   Undue Prejudice Resulted from the Delay

The key evidence was lost as a result of Plaintiff's delay in bringing suit. Every year that Plaintiff delayed it destroyed another year worth of business records.[108] Had Plaintiff brought suit any time prior to 2001, Defendant would have had the benefit of Plaintiff's business records dating back to when Defendant's principal began his business in the Valley in 1994. It does not matter whether this record destruction as a "standard business practice" of Plaintiff. Loss of data due to the passage of time prejudices Defendant, regardless of its motivation.

Additionally, the memories of the potentially key witnesses to this case were allowed to fade just a bit more, or in some cases were lost all together. If Plaintiff had brought suit when Defendant first began using the South Texas mark in 1994, Defendant would have had the benefit of the testimony of Juan A. Molina, Sr., who passed away[109] and business records dating back to 1989. Defendant would have also had the benefit of fresh memories of witnesses. As it stands now, Defendant is left to try to assemble the pieces of Plaintiff's history with incomplete document records dating back only to 2003, missing testimony of Plaintiff's founder, Juan A. Molina, Sr., testimony about events occurring over ten years ago and many answers of "I can't remember" or "I do not recall" or "I seem to recall" or "I think it was" from Plaintiff's key witnesses whose memories have understandably faded throughout the years.[110] Forcing

---

[106] *Seghers v. Gardella*, 55 F. Supp. 914, 915 (N.D. Ohio 1944).
[107] Maria Molina Gonzales Dep. 39:23-40:1.
[108] Maria Molina Gonzales Dep. 65:24-69:18; Juan Molina Dep. 64:10-66:24.
[109] Juan Molina Dep. 21:8-9.
[110] *See, e.g.*, Juan Molina Dep. 31:1-7; 32:11-15, 19-22; 75:14-18; 84:3-10; 89:9-21.

Defendant to defend with the incomplete evidence caused by Plaintiff's unwarranted delay would be prejudicial and Plaintiff's claims should be barred by the doctrine of laches.

Defendant is also prejudiced because its business continued to grow and thrive as the investment in its goodwill increased from year to year. When Plaintiff did not pursue its threats from its 2001 cease and desist letter, Defendant believed that Plaintiff had decided not to pursue the matter further. As a result, Defendant spent time and effort building customer goodwill in its name. Defendant's sales increased and his customer base grew substantially from 1994 to present and from 2001 to present. Allowing Plaintiff to wait until Defendant's business is considerably more successful than it was seven years ago would be prejudicial to Defendant.

### IV.     PLAINTIFF'S CLAIMS ARE BARRED BY ACQUIESCENCE

In addition to being barred by the laches, Plaintiff's claims are barred by acquiescence. In the Fifth Circuit, acquiescence is a separate defense from laches.[111] The defense of acquiescence requires proof that "(1) the plaintiff knew or should have known of the defendant's use of the trademark; (2) the plaintiff made implicit or explicit assurances to the defendant; and (3) the defendant relied on the assurances."[112] Plaintiff's lack of action after sending its cease and desist letter could have reasonably induced reliance.[113] As explained below, Defendant relied on Plaintiff's assurances and Plaintiff's claims are barred by acquiescence.

a. *Plaintiff Undeniably Knew of Defendant's Use of the South Texas Neon Name*

Based on Plaintiff's claimed trade territory, it should have known about Defendant shortly after Defendant began business in 1994. As evidenced by their cease and desist letters in 2001, Plaintiff undeniably knew of Defendant's existence at least as early as 2001.

b. *Plaintiff Made Implicit Assurances to Defendant*

---

[111] *Elvis Presley*, 141 F.3d at 206.
[112] *Bd. of Regents v. KST Elec., Ltd.*, 550 F. Supp. 2d 657, 664-665 (W.D. Tex. 2008).
[113] *Elvis Presley,* 141 F.3d at 205.

By not taking the action threatened in its cease and desist letter, Plaintiff implicitly assured Defendant that it was not going to pursue claims against the Defendant. In 2001, Maria "Toni" Molina called the Defendant and asked them to change their name.[114] When Defendant indicated it had the right to use its name,[115] Plaintiff sent the cease and desist letters. Thereafter, Plaintiff took no further action and Defendant was assured by Plaintiff's decision not to pursue the action as threatened in the letters.[116]

*c.   The Defendant Relied on Plaintiff's Assurances*

As explained above, Defendant made business decisions based on Plaintiff's lack of action. Namely, Defendant deemed it legal to continue its use of the South Texas mark and to continue to grow its business and increase its sales and marketing in the Valley. Accordingly, Defendant was prejudiced by Plaintiff's implicit assurances.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendants respectfully requests that the Court grant this Motion for Summary Judgment and enter judgment in Defendants favor on all pending claims.

Dated: June 16, 2009                                   Respectfully submitted,

                                                Charles W. Hanor
                                                Hanor, Lively & Cernyar, PLLC
                                                750 Rittiman Road
                                                San Antonio, Texas 78209
                                                Telephone: (210) 829-2002
                                                Facsimile: (210) 829-2001
                                                chanor@hanor.com

                                                *Charles W. Hanor*

                                                _____

                                                Charles W. Hanor

---

[114] Maria Molina Gonzales Dep. 40:12-41:22.
[115] *Id.*
[116] Gonzales Declaration at ¶¶ 52-55.

Texas Bar No. 08928800

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2009, a true and correct copy of the foregoing pleading was electronically filed using the CM/ECF system which will send notification of such filing to the following:

MR. TED D. LEE
MR. MIGUEL VILLARREAL, JR.
GUNN, LEE & CAVE, P.C.
700 NORTH ST. MARY'S ST., SUITE 1500
SAN ANTONIO, TX 78205


_____

Charles W. Hanor